## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

JACQUELINE AVERY,

     Plaintiff,

v.                            Case No. 20-11810

SEDGWICK CLAIMS MANAGEMENT
SERVICES, INC. and EXTENDED DISABILITY
BENEFIT OF THE CHRYSLER GROUP LLC
GROUP INSURANCE PROGRAM

     Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION
### FOR JUDGMENT ON THE ADMINISTRATIVE RECORD
### AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT

Plaintiff Jacqueline Avery brings this action under 29 U.S.C. § 1132(a)(1)(B) of

the Employee Retirement Income Security Act of 1974 ("ERISA") to recover benefits

allegedly owed by Defendant FCA US LLC Long Term Disability Benefit Plan ("Plan[1]"),

as administered by Defendant Sedgwick Claims Management Services, Inc.

("Sedgwick"). (ECF No. 1.) Currently before the court are the parties' cross-motions for

judgment. (ECF Nos. 27-28.) Having reviewed the briefs, the court concludes that a

hearing is not necessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below,

the court will grant Defendants' motion and deny Plaintiff's motion.

_____

[1]     The parties identify this as the correct name of the plan (ECF No. 4, PageID.17;
ECF No. 27, PageID.1496.)

# I.  BACKGROUND[2]

## A.  The Plan

To provide long-term disability benefits to its eligible employees, FCA US, LLC ("FCA")[3] sponsored the Plan and acts as the Plan Administrator. (AR 1203.)[4] In this capacity, FCA has "the full and absolute authority to take all measures deemed necessary, appropriate or useful to administer the Plan in accordance with its terms and applicable law." (AR 1212-13.) These include "the power to determine eligibility." (AR 1213.) FCA may "allocate and delegate its responsibilities . . .  [and] employ such persons (including . . . TPAs [third-party administrators]) as may be required to assist in administering the Plan." (*Id.*) FCA may also "designate [a TPA] to carry out fiduciary responsibilities under th[e] Plan." (AR 1212.) Sedgwick is the TPA who "processes claims for the [Plan] pursuant to a service contract with [FCA]". (AR 1205; ECF No. 27, PageID.1503; ECF No. 28, PageID.1572.)

Plaintiff was a Participant in the Plan. To be eligible for benefits, she must meet specified conditions, including that she must:

> (e) be "totally disabled" because of disease or injury so as during the first 24 months of disability to be unable to perform the duties of the Participant's occupation, and after the first 24 months of disability be unable to engage in regular employment or occupation with [FCA].

---

[2]     The court admonishes Plaintiff for her failure to "include Proposed Findings and Conclusions . . .  consisting of separate, numbered paragraphs each of which states, reasonably [and] concisely, a separate material fact or conclusion" as required by the court's order. (ECF No. 8, PageID.48; ECF No.17, PageID.263.)

[3]     FCA is formerly named DaimlerChrysler Corporation.

[4]     "AR [page number]" refers to the pages in the sealed Administrative Record (ECF Nos. 20-25.)

(f)  apply for LTD benefits[5] and furnish satisfactory proof of disability in
     accordance with Section 4.02 . . .; and

(g)  Include satisfactory evidence that he or she made proper application
     for all "Other Income Benefits" described in Section 5.03.

(AR 1206.) Section 4.02 of the Plan provides: that "[p]roof of the continuance of the

disability must be furnished at such intervals as the TPA may reasonably require." (AR

1206.) Section 5.03 says that "[t]he Plan Administrator or the TPA has the right to

require as part of the proof of claim for LTD benefits satisfactory evidence of

[information relating to Other Income Benefits]." (AR 1210.)

### B.  Sedgwick's Review of Plaintiff's Claim

Plaintiff worked for FCA until July 2011, at which point she went on medical

leave. (AR 180, 195; ECF No. 1, PageID.3.) She applied for and received short-term

disability benefits.[6] (AR 358.) When that ran out in July 2012, Plaintiff made a claim for

long-term disability benefits under the Plan.

As required by Sedgwick, Plaintiff applied for and was eventually awarded

benefits under the social security disability insurance ("SSDI") program.[7] (AR 42, 251,

255, 258-59, 585.) Thanks to this, in September 2012, the Plan recovered over $15,000

of claim payment previously made to Plaintiff. (AR 518, 544-45, 905.)

Sedgwick initially approved Plaintiff's claim for benefits under the Plan in August

2012 "based on the accepted, totally disabling condition(s) of Right Lower Extremity

---

[5]       Section 7.04 provides, "Any Participant shall be entitled to file a written claim for
benefits with the TPA setting forth the benefits for which he or she feels entitled and the
reason therefor.  If the TPA receives an oral claim for benefits, it shall advise such
individual to file a written claim . . . The TPA shall determine the Participant's rights to
benefits within 90 days after receipt of the written claim . . ." (AR 1213.)
[6]       It is not disputed that Sedgwick also processed Plaintiff's short-term disability
claim.
[7]       The Social Security Administration ("SSA") administers this program.

3

Neuropathy & Reflex Sympathetic Dystrophy Lower Extremity." (AR 1167.)  Sedgwick possessed the following documents, which apparently supported Plaintiff's entitlement to benefits as of June 2, 2014 (AR 1055):

- August 18, 2011 note of Plaintiff's visit to Kingston Family Health Care (AR 345-49): On that day, Plaintiff presented with lower extremity pain previously diagnosed as neuropathy in lower right leg. (AR 345.) She was diagnosed with "mononeuritis of lower limb." (AR 348.)

- August 19, 2011 "Lower Extremity" form signed by Darla Mays, PA-C (AR 351-56): Plaintiff was certified as being disabled from right leg neuropathy. (AR 351.)

- October 14, 2011 report of the October 11, 2011 independent medical examination ("IME") with Dr. Hermann Banks, a board-certified neurologist (AR 789-94): Dr. Banks diagnosed Plaintiff with "[r]ight lower extremity pain with paresthesia and dysesthesia as described in addition to edema" and confirmed the appeared presence of neuropathy. (AR 793.) Dr. Banks recommended that Plaintiff remain off work for eight weeks with the hope of identifying the origin of her edema during that time. (*Id.*)

- January 9, 2012 note of the January 4 visit for leg pain with Dr. Michael Louwers and neurologist Dr. Ronald Wasserman at the University of Michigan Back and Pain Center ("U of M") (AR 313-15): Plaintiff was diagnosed with complex regional pain syndrome type I in the right leg. (AR 314.)

- January 19, 2012 report of an IME performed that day by neurologist Dr. David Gaston (AR 297-303): Dr. Gaston diagnosed Plaintiff with "Complex

Regional Pain Syndrome Type II in view of the associated peripheral neuropathy." (AR 302). Plaintiff was found "disabled . . . for approximately 4 months." (AR 303.)

- May 9, 2012 "Lower Extremity" form signed by Dr. Robert Brengel, Plaintiff's primary care doctor whose specialty is family medicine (AR 227-29, 691-695): Dr. Brengel indicated that Plaintiff was disabled from "Complex Regional Pain Syndrome/Reflex Sympathetic Dystrophy" with co-morbid conditions being obesity, depression, osteopenia, and dyslipidemia. (AR 227, 691.) Enclosed were notes of Plaintiff's visits to U of M on April 2 and 9, 2012, which remarked improvements and reduced pain after the catheter insertion to Plaintiff's leg on March 12, 2012 (AR 696-703.)

- June 26, 2012 "General Diagnosis" form signed by Dr. Brengel (AR 227-29): Dr. Brengel indicated the same diagnoses as on May 9 form. (AR 227.) Enclosed were Dr. Brengel's handwritten notes, records of Plaintiff's visits to U of M on April 2 and 30, 2012, and an outpatient chemical and pain medication management consultation with Dr. Herbert Malinoff on June 12, 2012. (AR 230-49.) The notes of the April 30 visit indicated that Plaintiff had not been doing well and her pain had returned after the catheter was removed on April 9. (AR 238-39.)

- September 10, 2012 and January 8, 2013 "General Diagnosis" forms signed by Dr. Brengel (AR 819-24, 1146-48): Dr. Brengel identified "Complex Regional Pain Syndrome" as Plaintiff's disabling diagnosis with co-morbid conditions of depression, opiate dependence, and obesity. (AR 819, 1146.)

5

- February 6, 2013 note of Plaintiff's visit that day with Dr. Matthew Wixson and Dr. Wasserman at U of M (AR 1107-1110): On that day, Plaintiff reported over 90 percent pain improvement and having weaned off oxycodone. (AR 1108.)

- March 4, 2013 note of a follow up visit on that day with Dr. Golshid Tazhibi and Dr. Wasserman at U of M (AR 1104-06): Then, Plaintiff reported "80% relief of her pain." (AR 1105.)

- June 4, 2013 note of visit with Dr. Majed A. Nounou, a cardiologist (AR 1099-1100): Plaintiff complained of pain, numbness, tingling, and swelling in her right lower leg. (AR 1099-1100.) Dr. Nounou ordered a venous mapping and diagnosed Plaintiff with venous insufficiency, varicose veins of lower extremities, obesity, depressive disorder, hypertension, pain in limb, and edema. (AR 1100.)

- June 4, 2013 "Lower Extremity" form signed by Dr. Brengel (AR 827-30): Dr. Brengel certified "Complex Regional Pain Syndrome" as Plaintiff's disabling diagnosis with obesity as the co-morbid condition. (AR 827.)

- June 24, 2013 report of a "Bilateral Lower Extremity Venous Study," ordered by Dr. Wasserman and reviewed by Dr. Shaun Gabriel (AR 843-44); Plaintiff presented with "[right lower extremity] chronic pain and swelling." (AR 843.) The preliminary review of the imaged veins on both legs ruled out deep vein thrombosis but revealed evidence of reflux. (AR 843-44.)

- August 12, 2013 note of a follow-up visit with Dr. Nounou (AR 845-49): Dr. Nounou confirmed that Plaintiff's "venous mapping showed severe bilateral greater saphenous venous insufficiency" with "more symptoms on the right."

(AR 846.) Dr. Nounou suggested (and eventually performed[8]) an endovenous ablation procedure on Plaintiff's right leg. (AR 847.)

- January 1, 2014 "Lower Extremity" form signed by Dr. Brengel (AR 837-40): Dr. Brengel certified that Plaintiff was disabled by Reflex Sympathetic Dystrophy in right leg and had co-morbid conditions of obesity, lumbar radiculopathy, and peripheral vascular insufficiency. (AR 837.)

- April 24, 2014 "Certificate of Continuous Disability" signed by Plaintiff (AR 864-65): Plaintiff identified her disabling conditions as "Complex Regional Pain Syndrome & Venous reflux disease." (AR 864.) She described her limitations as being "unable to stand for longer than 10 minutes, walk for more than 500 feet, [and] knee[;] bending cannot be done without excessive swelling or chronic pain [; and] [c]oncentrating is very difficult to do [due to] [c]hronic pain meds." (*Id.*)

- April 17, 2014 note of a visit with Dr. Nounou to follow up on the right leg ablation (AR 1072-74): Dr. Nounou decided to wait on the ablation procedure on the left leg and discussed the possibility of ablating below the knee of the right leg based on venous mapping results. (AR 1074.)

- May 21, 2014 "Lower Extremity" form signed by Dr. Brengel (AR 988-91, 1057-60): Dr. Brengel indicated that Plaintiff was disabled by reflex sympathetic dystrophy in her right leg and had co-morbid conditions of leg pain, obesity, lumbar radiculopathy, and peripheral vascular insufficiency. (AR 988, 1057.)

---

[8] This procedure was performed on February 12, 2014. (AR 880-81.)

On June 11, 2014, Sedgwick received an email from FCA's Corporate Investigations, which indicated that Plaintiff was seen driving – which she was medically restricted from doing – and suspected with running a business out of her home. (AR 935-36.) This prompted Sedgwick's request that Plaintiff undergo an IME with Dr. Joel Shavell, board certified in internal medicine and rheumatology, for an evaluation of her neuropathy and reflex sympathetic dystrophy in the right leg diagnoses. (AR 975-79.)

Dr. Shavell examined Plaintiff on July 15, 2014.[9] (AR 975.) He took Plaintiff's medical history, reviewed her medical records,[10] and performed a physical examination of Plaintiff. (AR 975-78.) During the physical examination, Dr. Shavell noticed Plaintiff "walked in quickly with a normal gait and had no problems getting undressed, . . . getting in and out of the room[,] . . . moving, and . . . functionally." (AR 977.) Dr. Shavell described his findings in his report:

> Lower extremities revealed no pain, good range of motion of the hips, knees, ankles and feet, no swelling, no redness, no warmth, and no coldness. A normal exam is noted. At the onset of the physical examination, as I was taking a pressure, she was able to fold her knees and legs under her like a Buddha position on the table, and was then able to get up quickly from a supine position, without any weakness or loss of strength in the lower or upper extremities. I also measured her calf, which was one inch from the inferior patella; the right leg was 19 and the left leg was 18, no real significant abnormality. Neurologically, Romberg revealed she was able to balance herself, she walked herself, she started to walk on her heels and toes, of course she is very heavy, and could not do this for a long time, but she was able. There was absolutely no evidence of any loss of strength. I then checked her grossly for any neurological deficits in her lower extremities, and there were no significant neurological

---

[9]     On that day, FCA also scheduled a surveillance of Plaintiff at Dr. Shavell's office. (AR 940.)

[10]     These included: "plant notes," "notes from Marlette Regional Hospital," an Attending Physician Statement, signed by Robert Brengel, D.O.," "progress notes from Robert Brengel, D.O.," notes from the Heart & Vascular Institute of Michigan, Majed A. Nounou, M.D.," and "records from University of Michigan Health System, Ronald Arthur Wasserman, M.D." (AR 976-77.)

deficits. She did have a slightly hyporeflexic knee on the right; however, I
did not pursue it because the strength in her legs was more than
adequate. The range of motion on the knees was adequate and there
were no indications that she had any neurological. Again, I would like to
note that it is my opinion that the ability to sit perpendicularly on the
examination table with feet and legs turned in cannot be performed with
complex pain syndrome, for which she has had treatment in Ann Arbor.

(AR 978.)

Dr. Shavell concluded that he did not see any evidence of a regional complex

pain issue because Plaintiff exhibited no normal symptom thereof. (*Id.*) He attributed the

swelling of the leg to Plaintiff's obesity "because tissue compresses on vein and vein

w[ould], at times, cause swelling of the leg." (*Id.*) He emphasized the fact that Plaintiff

could bear weight on her ankle, heels, and toes despite her weight. (AR 979.)

Ultimately, Dr. Shavell opined that Plaintiff's disability was unsubstantiated and that she

could return to full duty immediately. (*Id.*)

On July 17, 2014, Plaintiff saw Dr. Nounou for venous mapping results. (AR 970-

72.) Plaintiff presented complaints of pain and edema in both legs and feet (worse in the

right), numbness in her toes, and burning sensation in her ankles. (AR 970.) No

diagnosis was discussed at this visit and no specified plan of care was recorded. (AR

970, 972.)

After receiving Dr. Shavell's report, on July 21, 2014, Sedgwick sent a letter to

Plaintiff to inform her that the IME found her capable of working. (AR 974.) The letter

directed Plaintiff to come to the medical department in her worksite to be evaluated for

returning to work and said that her benefits "may be suspended effective July 21, 2014

pending the outcome of the ability to work examination." (*Id.*)[11] Sedgwick also called

---

[11]    On the same day, Sedgwick "backed down [Plaintiff's] benefits based on IME
results" to July 21, 2014 and removed the July 25, 2014 scheduled payment. (AR 943.)

Plaintiff, and in response to the request that she undergo an evaluation at work, Plaintiff said that she had been in bed for three days and could not drive. (AR 943.)[12]

Nonetheless, on July 22, 2014, Plaintiff showed up to the onsite examination as requested. (AR 945.) The plant nurse saw Plaintiff walking in by herself with steady gait. (*Id.*). According to the plant doctor, Plaintiff was alert, oriented, and calm in the waiting room, but appeared anxious in the exam room, which she attributed to pain. (*Id.*) An examination of Plaintiff's lower right and left legs revealed no stasis dermatitis, normal dorsalis pedis pulse, and no pretibial edema. (*Id.*) Additionally, she was seen walking without a limp. (*Id.*)

Also on July 22, 2014, Plaintiff received Dr. Shavell's IME report, which she told Sedgwick was "bold face lies." (AR 944.) Plaintiff stated that her home health workers could verify that "she is in bed more than not." (*Id.*) In response to Plaintiff's inquiry into an appeal, Sedgwick told her to "submit a letter substantiating her dispute of the exam," which would be forwarded to the "Appeal unit." (AR 945.)

On July 28, 2014, Plaintiff submitted a letter "to appeal [her] recent return to work decision." (AR 964-72.) Therein, she provided an overview of her medical history, ending with her last visit with Dr. Nounou on July 17, 2014. (AR 964.) She explained that she had not been coming to see her neurologist at U of M because she was "trying to take care of the secondary issue of venous insufficiency," but once it was resolved, she would resume the neurology treatment. (*Id.*) Further, Plaintiff made specific

---

[12]     While Defendants argue that "[a]t that point, Sedgwick had not issued a determination on Plaintiff's continued eligibility for LTD Plan benefits (rather, Sedgwick had only advised her. . . that she was to work for a determination of her ability to work)" (ECF No. 28, PageID.1579-80), the claim notes marked July 21, 2014 as "[d]enial letter date." (*See* AR 950.)

challenges to Dr. Shavell's statements and findings in his report. (AR 964-65.) Plaintiff included with her letter several documents: (1) a list of past appointments at U of M, the latest being July 8, 2013 with Dr. Wasserman (AR 967), (2) a report of the bilateral lower extremity venous study on June 24, 2014 (AR 968-69), and (3) the note of her visit on July 17, 2014 with Dr. Nounou (AR 970-72).

On August 4, 2014, Sedgwick sent Plaintiff a letter to "acknowledge receipt of [her] request for appeal of Long Term Disability Benefit" and informed her that her "appeal was received by Sedgwick on July 30, 2014." (AR 957.) Sedgwick further indicated that Plaintiff's "request for appeal of denied extended disability benefits will be reviewed by [its] Appeals Units and [she] will receive a written response by September 13, 2014." (*Id.*)

On August 8, 2014, Sedgwick called Plaintiff to ask if she was planning on providing any additional information, which she responded "no." (AR 949.) Also on that day, Sedgwick reviewed its files and noted as "[d]iscrepancies, errors, issues" the facts that there was "no denial [letter] outlining the reason for denial or with appeal rights" and "the letter [sent to Plaintiff] only request[ed] that [she return to work]." (AR 950.) Another note entry identified "issue[s]" of "letter on file notes suspension of benefits, not denied" and "no appeal rights included in the letter." (AR 951.)

On August 20, 2014, a longer letter was prepared, restating that Plaintiff no longer satisfied the eligibility requirement based on her IME result. (AR 954-55.) The letter directed Plaintiff to report to FCA's Human Resources department for an evaluation of her ability to return to work, and said that pending its outcome, her benefits "may be terminated effective July 21, 2014." (*Id.*) The letter then informed

Plaintiff of her right to appeal within 180 days by submitting a written request with additional comments, documents, or records relating to her claim. (*Id.*) She was also told of her right to request a copy of the documents, records, or other information in Sedgwick's possession that were relevant to her claim. (*Id.*)

On August 25, 2014, Sedgwick called Plaintiff advising her of the August 20 letter, which was sent that day. (AR 452.) Sedgwick told her that she would not need to report to Human Resources. (*Id.*) Sedgwick then confirmed with Plaintiff that her claim was still on appeal. (AR 453.)

As part of the appeal process, Sedgwick consulted with Dr. David Hoenig, a board-certified neurologist, for an independent record review ("IRR") on September 4, 2014. (AR 660-64.) After unsuccessfully attempting to discuss with Dr. Nounou and going through numerous medical records, Dr. Hoenig opined that Plaintiff was not disabled from performing work as of July 22, 2014. (*Id.*) He elaborated, "The last neurological exam in the medical record is from February 2, 2013. After her spinal cord simulator (SCS), [Plaintiff] has a normal neurological exam." (AR 663.) However, Dr. Hoenig affirmed that Plaintiff had neurological deficits from complex regional pain syndrome between July 21, 2011 and February 6, 2013, during which she would require work restrictions. (*Id.*)

On September 12, 2014, Sedgwick sent Plaintiff a letter indicating that her appeal was denied. (AR 658-59.) The letter said that the review included medical documentation from Plaintiff's treating sources and independent medical examiners (AR 658.) It also informed Plaintiff of Dr. Hoenig's IRR, his unsuccessful attempts to speak with Dr. Nounou, and his conclusion and rationale. (AR 658-69.) The letter ended with

the advisement of "the Claim Administrator's final decision" and Plaintiff's rights to sue

and access her records. (*Id.*)

Eight months later, on May 18, 2015, Plaintiff's attorney sent a letter to Sedgwick

demanding that Plaintiff's benefits be "immediately [and] retroactively" reinstated. (AR

654.) Enclosed thereto was a letter from Dr. Brengel dated April 15, 2015, which

disputed Dr. Shavell's findings. (AR 655.) Dr. Brengel also indicated that Plaintiff "had

an EMG performed by K. Fram, M.D., in December of 2014 and ongoing treatment from

that point." (*Id.*) He then relayed that "Dr. Fram believe[d] that [Plaintiff] ha[d] reflex

sympathetic dystrophy in her right lower extremity by history, chronic S1 radiculopathy

bilaterally, severe peripheral polyneuropathy, and bilateral tarsal tunnel syndrome." (*Id.*)

Dr. Brengel concluded that Plaintiff "remain[ed] disabled due to the difficulties with her

right leg." (*Id.*)

On July 8, 2015, Sedgwick sent a letter informing Plaintiff that her claim was

"under re-review" and that she can submit additional medical information by July 28,

2015. (AR 651.) No additional information was provided. However, Plaintiff claims that

she never received this letter because it was sent to an outdated address. (ECF No. 29,

PageID.1607.)

For the re-review, Sedgwick obtained a new IRR by neurologist Dr. Mark

Friedman. (AR 599-602). On August 6, 2015, Dr. Friedman opined that Plaintiff was not

disabled from performing any work as of July 22, 2014 "[b]ased on the clinical objective

evidence" in Plaintiff's medical documentation up until July 2014. (AR 601.) On

September 16, 2015, having reviewed Dr. Brengel's April letter, Dr. Friedman held to his

previous determination, reasoning that the letter "did not include any new examination findings or results of the testing." (AR 595.)

By a letter dated September 30, 2015 to Plaintiff's attorney, Sedgwick indicated that the discontinuation of Plaintiff's benefits was upheld. (AR 592-93.) The letter enumerated the reviewed medical documentation, described Dr. Friedman's IRR, his discussion with a nurse at Dr. Nounou's office, and his findings of no clinically supported disability after July 22, 2014. (*Id*.) Plaintiff was given an opportunity to appeal this updated determination, but she did not do so. (*Id.*)

## II.  STANDARD

The court must first decide what standard of review applies. Plaintiff argues that a de novo standard applies because (1) the Plan does not "appear on its face to grant [] discretion to Sedgwick" and "it is not clear that a decision by Sedgwick is entitled to differential review", and (2) "it is indisputable in this case that Sedgwick did not comply with the Department of Labor claims regulations." (ECF No. 27, PageID.1527.) Defendants challenge these contentions, maintaining that the court should conduct its review using the arbitrary and capricious standard.

### A.  Grant of Discretion

"A federal court considering a [denial of benefit] claim [under § 1132(a)(1)(B)] starts with the presumption that it should review the administrator's denial of benefit de novo. If, however, the terms of the plan give the administrator discretionary power to make benefits decisions, the court reviews the administrator's denial under a differential arbitrary-and-capricious standard." *Card v. Principal Life Ins. Co.*, 17 F.4th 620, 624 (6th Cir. 2021) (internal citations omitted). The Sixth Circuit "'has consistently required that a

14

plan contain a *clear* grant of discretion' to the administrator or fiduciary before applying

the deferential arbitrary and capricious standard." *Frazier v. Life Ins. Co. of N. Am.,* 725

F.3d 560, 566 (6th Cir. 2013) (emphasis in original) (citing *Perez v. Aetna Life Ins.*, 150

F.3d 550, 555 (6th Cir. 1998)). But no "magic words" are necessary, *id.,* and "[t]he mere

fact that language could have been clearer does not necessarily mean that it is not clear

enough," *Perez*, 150 F.3d at 558 (citing *Yeager v. Reliance Standard Life Ins. Co.,* 88

F.3d 376, 381 (6th Cir. 1996)).

Here, the court finds that Sedgwick is "a fiduciary to whom [FCA] granted

discretion for the more lenient standard to apply." *Frazier*, 725 F.3d at 566. A plan "may

expressly provide for procedures for allocating fiduciary responsibilities." *Id.* (citing 29

U.S.C. § 1105(c)(1)). Plaintiff concedes that "[t]here is no dispute that [the] Plan grants

the 'Plan Administrator' to determine eligibility for benefits, [and] the Plan Administrator .

. . is FCA." (ECF No. 27, PageID.1527.) As Defendants point out, the Plan authorizes

FCA to delegate "fiduciary responsibilities" to a TPA to interpret the Plan and determine

the eligibility for benefits thereunder. (ECF No. 28, PageID.1585-86.)[13] Here, the record

shows, and it is undisputed,[14] that FCA delegated its claim administration function to

Sedgwick. *See Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734,

742 (6th Cir. 2005) (holding that if the plan grants the plan administrator discretionary

authority and the plan administrator "properly designates another fiduciary" to exercise

---

[13] The Plan expressly shields the Plan Administrators from any liability "for an act or omission of the person(s) to whom any duties are delegated." (AR 1211.)
[14] Plaintiff has consistently described Sedgwick as "the claim administrator" of the Plan. (*See e.g.,* ECF No. 27, PageID.1503.)

that discretion, then the arbitrary and capricious standard applies to the decisions of both the plan administrator and the designated third party).

Contrary to Plaintiff's contention, the grant of discretion to the TPA – Sedgwick – is clear from the Plan's language. For example, to be eligible for benefits, a Participant must "apply … and furnish satisfactory proof of disability in accordance with Section 4.02," which provides that "[p]roof of the continuance of the disability must be furnished at such intervals as the TPA may reasonable require." (AR 1206.) The Participant must also "include satisfactory evidence that [] she made proper application for all 'Other Income Benefits' described in Section 5.03," and that section specifies that "[t]he TPA "has the right to require as part of the proof of claim for LTD benefits satisfactory evidence" of other income benefits (AR 1206, 1210.)[15] Courts in the Sixth Circuit have routinely held that this sort of language granted discretion to the claim administrators. *Perez,* 150 F.3d at 556 (holding that the language in the Plan allowing the defendant to request satisfactory evidence, review it, and make a benefit determination clearly granted discretion); *Yeager,* 88 F.3d at 380-81 (holding that the plan's requirement that claimant submit "satisfactory proof of Total Disability to us" was sufficient grant of discretion to warrant application of arbitrary and capricious standard of review); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (granting discretion "on the basis of medical evidence satisfactory to the Insurance Company"); *Leeal v. Cont'l Cas. Co.,* 17 F. App'x 341, 343 (6th Cir. 2001) (upholding the district court's finding that discretionary authority was conferred based on language about written proof of loss,

---

[15] The Plan also provides that "a decision on any matter within the discretion of the . . . TPA . . . shall be binding on all Participants." (AR 1214.)

time payment of claim, and particularly the requirement that claimant submit "due written proof of loss" to receive benefit); *Fendler v. CNA Grp. Life Assur. Co*, 247 F. App'x 754, 759 (6th Cir. 2007) ("Our circuit has repeatedly held that this "due proof" language confers discretion on the claims administrator to determine what type of proof is 'due,' such that the court must apply the arbitrary and capricious standard of review.") (citation omitted); *Zack v. McLaren Health Advantage, Inc.,* 340 F. Supp. 3d 648, 656 (E.D. Mich. 2018) (Berg, J.) ("This Circuit has interpreted language involving 'proof of loss' as indicating the claims administrator to whom a participant is instructed to submit that 'proof of loss' has full discretion to administer the plan."); *Weathers v. Mutual of Omaha Ins. Co.*, No. 2:08-cv-14788, 2009 WL 1620417 (E.D. Mich. Jun. 9, 2009) (Cleland, J.) (holding that the language of the Plan stating that benefits for loss will be paid "upon receipt of due written proof" and reserving the right to "make a decision" only after the plan administrator receives "information necessary to evaluate the claim" vested discretion).

## B.  Procedural Errors

Plaintiff also argues that the *de novo* standard applies because Sedgwick failed to comply with the Department of Labor ("DOL") claim-procedure regulations. (ECF No. 27, PageID.1527.)[16] The court notes that the Sixth Circuit has not issued a clear guidance on whether the de novo standard applies in a case involving procedural deficiencies, but at least two district courts' opinions, which were highly regarded on

---

[16] Plaintiff does little to develop this argument in the "Standard of Review" section of her motion. (ECF No. 27, PageID.1527.) However, the court presumes that the alleged "indisputable" nonconformances to the DOL's claims-procedure regulation in support of the de novo standard are the same as those later presented in her brief. (ECF No. 27, PageID.1527, 1529-33.)

appeal, have adopted this rule.[17] But in any case, Plaintiff has previously had a full

opportunity to assert procedural challenges. (ECF Nos.8, 9, 14.) On December 4, 2020,

she filed a "Statement of Procedural Challenge" claiming ten errors that supposedly

prevented her from getting a "full and fair review of her claim." (ECF No. 9, PageID.52.)

Defendants then moved the court to reject Plaintiff's statement and responded to the

deficiencies alleged by Plaintiff in details. (*See* ECF No. 12.) In turn, Plaintiff conceded

that some of the points she had raised were not procedural, but were substantive

challenges. (ECF No. 14, PageID.180.) She then focused her arguments on only two

contentions, which led the court to assume that she had conceded the others. (*Id.*,

PageID.179-80; ECF No. 16, PageID.255.)

One of Plaintiff's unabandoned challenges was Defendants' alleged failure to

properly notify her of the initial benefit discontinuation and give her a reasonable

opportunity to appeal. (ECF No. 16, PageID.255.) In its September 14, 2021 opinion

and order, the court found that Plaintiff did not present a meaningful procedural defect

with the notification and appeals process. (ECF No. 16, PageID.256-58.)  Despite this,

---

[17]  In *Bustetter v. Standard Ins. Co.,* 529 F. Supp. 3d 693 (E.D. Ky. 2021), the Eastern District of Kentucky noted the lack of clear guidance from the Sixth Circuit and said that "until the Sixth Circuit provides additional guidance, . . . [it] will follow the prevailing view in the circuits and apply de novo review for violation of the 2002 version of the regulations." *Id.* at 703. The Sixth Circuit affirmed *Bustetter* and applauded it as a "notably thorough and well-reasoned opinion." *Bustetter v. Standard Ins. Co.,* No. 21-5441, 2021 WL 5873159, at *1 (6th Cir. Dec. 13, 2021). In *Myers v. Iron Workers Dist. Council of S. Ohio & Vicinity Pension Tr.,* No. 2:04-CV-966, 2005 WL 2979472, at *6 (S.D. Ohio Nov. 7, 2005), the Southern District of Ohio also applied the de novo standard of review "[c]onsidering the conflicting and potentially changing law on the subject of what standard of review applies in a case involving the procedural deficiencies." *Id.* at *6. The Sixth Circuit adopted the reasoning in *Myers'* "comprehensive and well-reasoned opinion." *Myers v. Iron Workers Dist. Couns. of S. Ohio & Vicinity Pension Tr.,* 217 F. App'x 526 (6th Cir. 2007).

Plaintiff's motion now asserts the same arguments (ECF No. 27, PageID.1531, 1533). The law-of-the-case doctrine mandates that "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *Rouse v. DaimlerChrysler Corp. UAW,* 300 F.3d 711, 715 (6th Cir.2002). "The doctrine also bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *Id.* If Plaintiff thought the court had been misled in finding no procedural error with the notification and appeals of her claim, she should have challenged the ruling at that time by moving to reconsider or seeking an appeal. But Plaintiff did not do so. That finding became the law of the case as of September 14, 2021, and the court will not revisit it here since Plaintiff has not persuasively presented any "extraordinary circumstances" warranting a revisitation.[18] *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988).

Plaintiff also asserts as a procedural deficiency Sedgwick's "fail[ure] to 'consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment' . . . when it relied on Dr. Shavell's report

---

[18] For example, Plaintiff's reply brief ostensibly asserts that the court erroneously analogized this case to *Kent v. United of Omaha Life Ins. Co.,* 96 F.3d 803 (6th Cir. 1996), because "*Kent* predates the adoption of the Department of Labor claims-procedure regulation." (ECF No. 29, PageID.1601.) This contention is misplaced; the *Kent* court specifically described the notice requirement in the "regulation codified at Title 29 Code of Federal Regulation Section 2560.503-1":

> These regulations specify that a fiduciary shall establish a claim procedure which informs a claimant of a denial of a claim within 90 days of receipt of the claim. The regulations further specify that the procedure should inform the claimant of the specific reasons for denial of the claim including pertinent plan provisions relating to the denial, and should inform the claimant of his or her right to seek review of the claim decision.

*Kent*, 96 F.3d at 806.

for its July 21, 2014 denial." (ECF No. 27, PageID. 1532).  This contention has already been waived with Plaintiff making no passable effort to address it in responding to Defendants' motion to reject her procedural challenge statement. (*See* ECF No. 16, PageID.253.) Besides, it is not a valid point. The requirement of a "consult[tation] with a health care professional who has appropriate training and experience in the field of medicine" only applies "in deciding an appeal of any adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(iii). Here, in determining Plaintiff's appeal, Sedgwick consulted with Dr. Hoenig, a board-certified neurologist, whose specialty is undisputedly appropriate in this instance.

In her reply, Plaintiff also notes how her surveillance was omitted from the administrative record. (ECF No. 29, PageID.1602.) This contention has already been raised in this case, though it was not one of Plaintiff's original alleged errors (ECF No. 9; *see* ECF No. 16, PageID.253-54.) Instead, Plaintiff brought this argument up in response to Defendant's motion to reject her procedural challenge statement. (ECF No. 14, PageID.180.) While Plaintiff now makes a more substantial effort in elaborating this point, it fails for the same reason the court gave on September 14, 2021. (ECF No. 16, PageID.255-56, n.2.) That is, Plaintiff still does not articulate what ERISA procedural protection was violated by her surveillance not being included in the administrative record. (*Id.*)

Accordingly, Plaintiff has failed to advance any substantial procedural defect to support a de novo review of Defendants' decision.[19]

---

[19] For this reason, remand is not an appropriate remedy in this case. *See Moore v. Lafayette Life Ins. Co.,* 458 F.3d 416, 436 (6th Cir. 2006) ("[A]dministrators need only substantially comply with . . . ERISA notice requirements in order to avoid remand.")

## C.  Arbitrary and Capricious Standard

With the Plan granting Sedgwick discretionary authority and no showing of any meaningful procedural error, the arbitrary and capricious standard of review applies. "Under this deferential standard, when it is possible to offer a reasoned explanation, based on the evidence for a particular outcome, that outcome is not arbitrary or capricious." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009); *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (citation omitted). The court must uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," even if the evidence could support a finding of disability. *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991); *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

However, even with the high deference, "federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005); *accord, e.g., Kramer v. Paul Revere Life Ins. Co.,* 571 F.3d 499, 507 (6th Cir. 2009). The court is guided by "[s]everal lodestars . . .: the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by

---

(citation omitted. But even if there was a substantial procedure error, the court notes that remand would only constitute a "useless formality." *Duncan v. Minnesota Life Ins. Co.,* 845 F. App'x 392, 402–03 (6th Cir. 2021). As explained below, Plaintiff had ample opportunity to submit additional evidence to substantiate her claim of disability after July 2014, and Defendants invited her to submit that evidence. Plaintiff also had the opportunity to submit evidence in support of her procedural challenges, yet she has never provided, or even suggested what new evidence could have been provided that would warrant a reversal of Defendants' decision.

the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT & T Umbrella Ben. Plan No. 1,* 795 F.3d 538, 547 (6th Cir. 2015) (quotation marks and citation omitted). Generally, "a court may consider only the evidence available to the administrator at the time the final decision was made." *Id.*

Plaintiff bears the burden of proving that Defendants' denial of her benefits was arbitrary and capricious. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).

### III. DISCUSSION

Plaintiff argues that the discontinuation of her benefits as of July 2014 was arbitrary and capricious because (1) Sedgwick ignored the SSA decision awarding SSDI benefits to Plaintiff (ECF No. 27, PageID.1534-36), (2) Sedgwick ignored information submitted by Plaintiff's treating physicians, but instead relied heavily on non-treating physicians' conclusions without an actual neurological exam. (*Id.*, PageID.1536-39, 1541-44), and (3) Sedgwick ignored Plaintiff's comments regarding Dr. Shavell's IME and report (*Id,* PageID.1539-41). The court addresses these contentions in turn and finds that Defendants' decision was not arbitrary and capricious.

### A.  SSA Disability Determination

"An ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was "totally disabled" is [a] factor that can render the denial of further long-term disability benefits arbitrary and capricious." *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006). In *Bennett v. Kemper National Services, Inc.*, 514 F.3d 547 (6th Cir. 2008), the Sixth Circuit said:

if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.

*Id.* at 553. "It is not necessary, however, that the plan administrator expressly distinguish a favorable SSA determination in denying disability benefits under the plan." *Leffew v. Ford Motor Co.,* 258 F. App'x 772, 779 (6th Cir. 2007) (citing *Whitaker v. Hartford Life & Accident Ins. Co.,* 404 F.3d 947, 949 (6th Cir. 2005)).[20]

Undisputedly, Sedgwick required Plaintiff to apply for SSDI benefits, in compliance of which she did and was eventually granted disabled status by the SSA in August 2012. (AR 995.) After Plaintiff was awarded SSDI benefits, the Plan benefited financially: in addition to reducing its prospective financial burden (*see* AR 1209), it recouped over $15,000 previously paid to Plaintiff (AR 518, 544.) Sedgwick did not explain in any of its denial letters to Plaintiff why it took a different position that what was adopted by the SSA. (AR 592-93, 656-57, 883-84, 974.)  Accordingly, under *Bennett,* the court "should weigh this in favor of a finding that the decision was arbitrary and capricious." 514 F.3d at 553. However, this does not mean that the failure to explain the decision is arbitrary and capricious per se. *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 986 (6th Cir. 2010) ("[T]he language of *Bennett* indicates that a failure to take into account a Social Security disability award is to be *weighed* in favor of a finding that the decision was arbitrary and capricious, not that such a decision is arbitrary and capricious per se.") (emphasis in original).

---

[20] Plaintiff has conceded that the version of the claim-procedure regulation in effect in 2014 does not explicitly require a denial of benefits notification o address a contrary SSA's determination. (ECF No. 14, PageID.178.)

Although the dissonance with the SSA's decision weighs against Defendants, that weight is not enough to tip the scale in Plaintiff's favor in this case.  First, there is no information on the SSA's determination of Plaintiff's disability, and this determination was made two years before Sedgwick decided to discontinue Plaintiff's benefits. *See Cox,* 585 F.3d at 303. Additionally, as indicated below, Plaintiff fails to show that the process and substance of Sedgwick's review warrants a finding that its decision was arbitrary and capricious. *See Wooden v. Alcoa, Inc.,* 511 F. App'x 477, 485 (6th Cir. 2013) (upholding the defendant's decision to terminate the plaintiff's benefit because even though the defendant's cavalier treatment of the SSA's determination weighed in favor of finding that the defendant was arbitrary and capricious, the review of the medical evidence and the conflict of interest did not); *Hurse v. Hartford Life and Accident Ins. Co.,* 77 F. App'x 310, 318 (6th Cir.2003) (finding that the mere fact that the defendant's conclusion "differs from that of the ALJ does not make it arbitrary and capricious" when "[t]he medical evidence ... was clearly susceptible to opposite conclusions as to the nature of [the plaintiff's] disability"); *Stano v. Lumbermens Mut. Cas. Co.,* No. 06-CV-10842-DT, 2007 WL 171601, at *5 (E.D. Mich. Jan. 18, 2007) (Cleland, J.) ("Even if Defendant completely failed to consider the SSA's decision, and it is not clear that it did, this is only one factor for the court to consider. . . Because Defendant has offered a reasoned explanation, based on the evidence, for its outcome, that outcome is not arbitrary or capricious.") (alteration, quotation marks, and citations omitted)

## B.  Medical Evidence

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. W.-S. Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003) Additionally, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). However, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. "[T]hey must instead give reasons for adopting an alternative opinion." *Curry,* 400 F. App'x at 59 (citing *Elliot v. Metro. Life Ins.,* 473 F.3d 613, 620 (6th Cir. 2006)). An acceptable reason could be that the treaters' opinion lacks supporting objective evidence, *see Morris*, 399 F. App'x at 986-87, *Curry*, 400 F. App'x at 59, or that treating sources lack expertise in the relevant field, *Black & Decker Disability Plan*, 538 U.S. at 832, *Simpson v. Liberty Life Assurance Co. of Boston*, No. 06-11077, 2007 WL 2050428, at *4 (E.D. Mich. July 17, 2007) (Cox, J.) (adopting report and recommendation).

Moreover, "nothing inherently objectionable about a file review ... in the context of a benefits determination" unless it proves "clearly inadequate." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Inadequacies can arise where:

- the file reviewer "concludes that the claimant is not credible without having actually examined him or her," *Judge v. Metro. Life Ins. Co.,* 710 F.3d 651,

663 (6th Cir. 2013), *Smith v. Cont'l Cas. Co.,* 450 F.3d 253, 263 (6th Cir.

2006);

- the file reviewer made conclusions that are "incredible on their face" when
  compared to the objective data and "thorough objectively verifiable
  determinations of the SSA and [the claimant's] treating physician, *Calvert,*
  409 F.3d at 296-97, *Koning v. United of Omaha Life Ins. Co.,* 627 F. App'x
  425, 434 (6th Cir. 2015); or

- "only [the administrator's] physicians, who had not examined [the claimant],
  disagreed with the treating physicians", *Hoover v. Provident Life and Acc. Ins.
  Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

Here, it was not arbitrary for Sedgwick to discontinue Plaintiff's benefits after it

received Dr. Shavell's IME finding of no evidence of a regional complex plain issue as of

July 2014. (AR 975-79.) In so doing, Sedgwick did not ignore contrary opinions of

Plaintiff's treating physicians. Plaintiff has not been able to point to any medical opinions

rendered by her treaters around July 2014 that she was totally disabled. Indeed, the

record shows Plaintiff visited Dr. Nounou a couple of days after her IME with Dr.

Shavell, and no diagnosis, plan of care, or limitations were noted at this visit. (AR 970.)

The only thing Sedgwick received after July 2014 with an opinion from her treating

physicians about her condition was a letter from Dr. Brengel dated April 15, 2015, and

that was nine months later.  To the extent Plaintiff attacks Dr. Shavell for not being a

neurologist, most of the opinions relied by Plaintiff were made by treating sources who

are not neurologists.

In reviewing Plaintiff's appeal, Sedgwick also did not arbitrarily rely on the file review by Dr. Hoenig. Plaintiff fails to advance any genuine challenges to the file review process and Dr. Hoenig's conclusion. First, while she claims that "[i]t appears that Sedgwick provided Dr. Hoenig with only a selection of records from June 24, 2011 to January 2014," (ECF No. 27, PageID.1523,) this contention is contradicted by the list of the records provided for review indicated in Dr. Hoeng's report (AR 660).

Similarly, Plaintiff's claim that "Sedgwick frustrated any opportunity for [Plaintiff] to submit documentation regarding her condition" lacks support. As of the date of Dr. Hoenig's review, Plaintiff had already provided documents with her July 28, 2014 letter. (AR 967-72.) On August 8, 2014, she was asked if she planned to provide any additional documentation, and she responded negatively. (AR 949.) She was again informed of her rights to provide documentation when she received the August 20, 2014 letter, yet none was provided.[21] Ultimately, it was Plaintiff who bore the burden to furnish satisfactory proof of disability and continuation thereof under the Plan. (AR 1206); *see Miller*, 925 F.2d at 984-85 (interpreting the plan provision, which stated that "on demand from the insurance company, further satisfactory proof, in writing, must be submitted to the insurance company that the disability continues," as putting the burden on the participant to prove continuing disability); *Likas v. Life Ins. Co. Of N. Am.,* 347 F. App'x 162, 167 (6th Cir. 2009) (holding that similar plan language made clear that

_____

[21]    While Plaintiff blames this on the timing of Sedgwick's appeal decision, despite having opportunities to do so in this case, she has never suggested what documents could have been provided that would warrant an alteration of Defendants' decision.

plaintiff must provide continued proof of his disability and the defendant does not bear the burden of showing that plaintiff's eligibility has ended).[22]

As Plaintiff acknowledges, Dr. Hoenig did not dispute the treating sources' opinions; indeed, he consulted them and incorporated the same medical restrictions and limitations prescribed by her physicians in his report. (ECF No. 27, PageID.1524; ECF No. 29, PageID.1606-07; AR 661-63.) He even tried to speak to the doctor who last treated Plaintiff. (AR 661.) Dr. Hoenig also made no credibility assessment of Plaintiff. (*See* AR 661-63.) His explanation for his conclusion – the lack of sufficient objective evidence – was a valid reason and is unchallenged by Plaintiff. *Morris*, 399 F. App'x at 986-87; *Curry*, 400 F. App'x at 59. Furthermore, Dr. Hoenig was not the only physician who found that Plaintiff was not disabled as of July 22, 2014. Dr. Shavell and FCA's plant doctor both examined Plaintiff and came to the same conclusion. (AR 945-46, 975-79.) Thus, Sedgwick could rely on Dr. Hoenig's review because his procedure was reasonable, his finding was rational, and there is not a sufficient reason to reject his review. *See e.g., Judge*, 710 F.3d at 663 (holding that the reliance on a file review was proper as "the file reviewers made no credibility determinations about Judge and did not second-guess Judge's treating physicians" and their findings "simply echo those of [the

---

[22]      Plaintiff argues that Defendants were required to make a vocational assessment to determine whether Plaintiff could perform her own job or regular employment with FCA. (ECF No. 27, PageID.1541.) The record shows that an ability-to-work evaluation was conducted on July 22, 2014. To the extent Plaintiff argues that Defendants must identify a job that she could perform to find that she was not totally disabled, the Sixth Circuit has also "rejected a legal rule requiring administrators to introduce vocational evidence identifying jobs that participants can perform." *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan,* 27 F.4th 405, 417 (6th Cir. 2022) (citing *Judge,* 710 F.3d at 662-63).

plaintiff's] own doctors, make note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies").

That Sedgwick's decision was not arbitrary and capricious is further demonstrated by its willingness to re-review Plaintiff's claim in July 2015, despite having no obligation to do so. In upholding its decision, Sedgwick relied on a separate IRR by another neurologist, Dr. Friedman. (AR 599-603.) As with Dr. Hoenig's review, Plaintiff does not advance any meaningful challenge to Dr. Friedman's process and findings. Again, Plaintiff faulted Sedgwick for not allowing her to provide documentation, except she did provide documentation in May 2015 (albeit insufficient) (AR 654-55) and Sedgwick tried to communicate to her that she could do so (AR 651). Plaintiff said she never received the July 8, 2015 communication, because it was sent to her old address. (ECF No. 29, PageID. 1607.) However, nothing indicates that this was done intentionally, nor does Plaintiff claim that she had updated Sedgwick with her new address.[23] Contrary to Plaintiff's assertion, Dr. Friedman did not just rely primarily on Dr. Shavell's findings (AR 601), though it was reasonable for Dr. Friedman to consider them as they were made during the pertinent time – July 2014. In addition to reviewing Dr. Shavell's report, Dr. Friedman also considered the notes of Dr. Nounou, who saw Plaintiff on July 17, 2014, and contacted his office. (AR 599-601.) Dr. Friedman was able to confirm with a nurse at Dr. Nounou's office that no disability issue was noted during that appointment or thereafter. (AR 600.)

---

[23]     It was incumbent on Plaintiff to "promptly furnish … information as is necessary to provide benefits under the terms of th[e] Plan." (AR 1217)

Like Dr. Hoenig, Dr. Friedman did not ignore the opinions of Plaintiff's treating physicians. He reviewed them and provided a neurology synopsis of them in his report, including those supporting previous disabilities. (*Id.*) He made no assessment of Plaintiff's credibility and even incorporated her account as described in the July 28, 2014 letter. (*Id.*). Other than Dr. Shavell's IME report (AR 975-79) and Dr. Nounou's note of the July 17, 2014 visit (AR 970-72), there is no other objective medical information for Plaintiff's condition in or around July 2014. Nine months after, Dr. Brengel second-handedly relayed that another physician, Dr. K. Fram, performed an EMG of Plaintiff and believed that Plaintiff had medical issues. (AR 655.)  However, no test result was provided, nor were there any records substantiating Dr. Fram's alleged beliefs. Dr. Friedman did not totally ignore what Dr. Brengel wrote in his April 2015 letter; instead, he justifiably found it unconvincing given that it "did not include any new examination findings or results of the testing." (AR 595.) In short, Dr. Friedman's conclusion that insufficient clinical evidence supported Plaintiff's disabilities, restrictions, or limitations was not "incredible on its face." In fact, Plaintiff concedes that this was "not surprising." (ECF No. 29, PageID.1608.)[24]

Accordingly, the court finds that Defendants did not unjustifiably ignore the opinions of Plaintiff's treaters, nor did they arbitrarily or capriciously rely on their physicians' findings in discontinuing Plaintiff's benefits.

---

[24]    Additionally, Plaintiff concedes that "the [administrative] record [in this case] is insufficient for the Court to make th[e] determination" that Plaintiff is entitled to benefits. (ECF No. 29, PageID.1608.)

### C.  Plaintiff's Comments

Lastly, Plaintiff condemned Defendant's decision as arbitrary and capricious because Sedgwick totally ignored her response to Dr. Shavell's IME report. (ECF No. 27, PageID.1539-40.) Plaintiff has failed to come forward with any evidence supporting this contention. While Sedgwick did not expressly address her comments, silence is not evidence of disregard. *See Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003) ("We are not persuaded that Hartford's silence with regard to the SSA record and findings is evidence that it did not consider them. . .."). Plaintiff also has failed to advance any authority or Plan language suggesting that Sedgwick had an obligation to specifically elaborate what it thought of Plaintiff's remarks. (ECF No. 29, PageID.1604.)

To the contrary, as Defendants point out, the regulations only require Sedgwick to "*[p]rovide a review* that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim. . ." 29 C.F.R. § 2560.503-1(h)(2)(iv) (emphasis added). Here, not only is there no indication that Sedgwick wholly disregarded Plaintiff's comments, but Sedgwick also deemed them material enough to provide them to Dr. Hoenig and Dr. Friedman for their review. (AR 660, 599.) And Dr. Friedman specifically incorporated Plaintiff's comments from her letter to his report. (AR 600.) Thus, the court finds that Sedgwick met its obligation to provide a review that considers Plaintiff's comments. 29 C.F.R. § 2560.503-1(h)(2)(iv). However, having already done that, nothing in the Plan, the regulations, or the case law required Sedgwick to credit Plaintiff's comments over contrary objective evidence (or lack thereof). *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (1996)

(holding that administrator did not act arbitrarily in discounting claimant's "subjective complaint [,that] are easy to make, but almost impossible to refute").

In short, Plaintiff has failed her burden of showing that Defendants wholesale ignored her comments or acted arbitrarily in not relying on them.

### IV. CONCLUSION

Defendants' decision to discontinue Plaintiff's benefits as of July 22, 2014 was the result of a deliberate and principled reasoning process and supported by substantial evidence. Accordingly,

IT IS ORDERED that Plaintiff's "Motion for Judgment" (ECF No. 27) is DENIED.

IT IS FURTHER ORDERED that Defendants' "Motion for Judgment on the Administrative Record" is GRANTED.

> s/Robert H. Cleland    /
> ROBERT H. CLELAND
> UNITED STATES DISTRICT JUDGE

Dated: September 21, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 21, 2022, by electronic and/or ordinary mail.

> s/Lisa Wagner     /
> Case Manager and Deputy Clerk
> (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\20-11810.AVERY.Cross-MotionsforJudgment.NTH.v2.docx